UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:<br><br>NICHOLAS A. SIVIERI, III<br><br>　　　　　Debtor<br><br>JÚLIO A. SIMÕES and<br>EDUARDO S. PEREIRA<br><br>　　　　　Plaintiffs<br>v.<br><br>NICHOLAS A. SIVIERI, III<br><br>　　　　　Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 7<br>Case No. 19-14253-CJP<br><br><br><br><br><br><br><br>Adv. Pro. No. 20-01034-CJP |

**BENCH RULING**[1]

I.   **INTRODUCTION**

In this adversary proceeding, Júlio Simões and Eduardo Pereira (the "Plaintiffs") seek to have debts to them determined to be excepted from discharge by the debtor, Nicholas Sivieri, III (the "Debtor" or "Defendant"), pursuant to 11 U.S.C. § 523(a)(6).[2] The debts the Plaintiffs ask me to determine are nondischargeable in their complaint [Dkt. No. 1] (the "Complaint") were established by prepetition judgments entered in their favor on March 12, 2012 in a civil action

---

[1] This Bench Ruling supersedes the oral ruling delivered on the record and constitutes the final version of the decision of the Court. It should be cited as the record decision. As a general matter, I issue oral rulings in conjunction with written bench rulings to facilitate the determination of matters. A bench ruling obviates the need for the parties to obtain a transcript of the reading of the decision into the record. The bench ruling format is less formal than a written "Memorandum of Decision" or "Opinion" and is intended to explain the basis for my decision in resolving a matter. It is not intended for publication.

[2] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code" or "Code").

they had brought against the Defendant in the Marlborough District Court (the "State Court") (Civil Action No. 10-21-CV-0843) (the "State Court Litigation"). The complaint in the State Court Litigation had two counts: (i) Count 1 sought damages for misclassification of the Plaintiffs as independent contractors in violation of Chapter 149, Section 148B of the Massachusetts General Laws and (ii) Count 2 sought damages for non-payment of overtime in violation of Chapter 151, Section 1A of the Massachusetts General Laws. (Trial Ex. 1). The judgments were admitted into evidence. (Trial Exs. 2 and 3).

I conducted a 3-day trial regarding the Complaint at which each of the Plaintiffs and the Debtor testified. Attorney Joyce Davis also testified briefly regarding certain workers compensation litigation involving the parties that was unrelated to the State Court Litigation. Both the Plaintiffs and Debtor were each represented by effective, competent counsel at trial.

The following decision constitutes my findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. To the extent any item described as a finding of fact is actually a conclusion of law (or the opposite), it is adopted as such. In making my determination, I have considered the testimonial and documentary evidence, my assessment of the credibility of the witnesses, and applicable law, all as I will discuss.[3] I have listened again to portions of the testimony and argument to supplement my notes from trial. For the reasons I will explain, I find that the Plaintiffs have not met their burden of proof under § 523(a)(6), and I will enter judgment in favor of the Debtor.

II.    **JURISDICTION AND APPLICABLE LAW**

Because the Plaintiffs' claims arise under the Bankruptcy Code, 28 U.S.C. § 1334(a) confers original jurisdiction on the United States District Court for the District of Massachusetts

---

[3] Trial Exhibits numbered 1 through 61 were admitted by agreement or at trial, except that certain of the stipulated exhibits numbered 23, 29, 39, 42, and 43 were ultimately excluded.

2

(the "District Court"), which has referred to this Court authority under 28 U.S.C. § 157(a) pursuant to Rule 201 of the District Court's Local Rules. This case is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(I), such that this Court has authority to determine the matter and enter final orders under 28 U.S.C. § 157(b)(1).

As the parties seeking to except their debts from discharge, the Plaintiffs bear the burden of proving each element under § 523(a)(6) by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991). "The Bankruptcy Code aims to strike a balance between providing debtors with a fresh start by discharging debts . . . , and avoiding abuse of the system." *Sauer Inc. v. Lawson (In re Lawson)*, 791 F.3d 214, 218 (1st Cir. 2015). "To this end, the Code exempts from discharge certain types of debt in an attempt to 'limit [ ] th[e] opportunity [for discharge] to the honest but unfortunate debtor.'" *Id*. (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (internal quotations and citation omitted)). "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy, and, for that reason, the claimant must show that his claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quotations omitted).

Section 523(a)(6) prevents a debtor from discharging debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A determination a debt is nondischargeable pursuant to § 523(a)(6) requires a showing of three elements: "that 1) the creditor suffered injury; 2) the debtor intended to cause the injury or that there was substantial certainty that the injury would occur; and 3) the debtor had no justification or excuse for the action resulting in injury." *Bauer v. Colokathis (In re Colakathis)*, 417 B.R. 150, 158-59 (Bankr. D. Mass. 2009) (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998) and

3

*Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853 (1st. Cir. 1997)). As summarized by the United States Court of Appeals for the First Circuit (the "First Circuit"):

> An injury is malicious "if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d [at 859] (quoting 4 Collier on Bankruptcy ¶ 523.12 (15th ed.1996)). The injury must have been committed in "conscious disregard of one's duties." *Id*. Willfulness requires "a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question." *In re Neronha*, 344 B.R. 229, 231 (Bankr. D. Mass. 2006).

*Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818–19 (1st Cir. 2013). In *Kawaauhau v. Geiger*, the United States Supreme Court held that § 523(a)(6) requires a debtor to intend the injury, not just the act that leads to the injury. 523 U.S. at 61–62. Therefore, recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). *Id*. at 64. Federal law determines what conduct reaches the level of willful and malicious injury, although state law can be illustrative. *See, e.g., Casella Waste Mgmt., Inc. v. Romano (In re Romano)*, 385 B.R. 12, 30 (Bankr. D. Mass. 2008).

Chapter 149, § 148B of the Massachusetts General Laws imposes strict liability for an employer misclassifying employees as independent contractors "where the circumstances indicate that they are, in fact, employees." *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 990 N.E.2d 1054, 1066 (Mass. 2013) (quotations and citation omitted). Chapter 151 of the Massachusetts General Laws is also a strict liability statute imposing personal liability, multiple damages and attorneys' fees for non-payment of wages and is "predicated on [a] claim of misclassification under [ch.] 149, § 148B" where a party labeled as an independent contractor is involved. *See id.* at 1060 n.10.

> [Mass. Gen. Laws ch. 149, § 148B(a)] provides that an individual performing any service . . . shall be considered to be an employee under [chapters 149 and 151] unless all three following requirements are met:

4

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
> (2) the service is performed outside the usual course of the business of the employer; and,
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

*Hogan v. InStore Grp., LLC*, 512 F. Supp. 3d 157, 174 (D. Mass. 2021) (internal quotations and citation omitted). "None of the statutory criteria speaks of the employer's intent; rather, all speak of the nature of the service provided." *Somers v. Converged Access, Inc.*, 911 N.E.2d 739, 749 (Mass. 2009) (acknowledging that "§ 148B is a strict liability statute, as is the wage act"). After a bench trial, the State Court determined that the Plaintiffs were employees and not subcontractors of NAS Development, LLC ("NAS"), an entity owned and operated by the Debtor, and held that NAS failed to pay the Plaintiffs overtime in accordance with Massachusetts law. The State Court awarded (i) Simões $12,393.75 in overtime pay, multiple damages of $24,787.50, attorneys' fees of $4,220, and interest – for a total judgment of $43,680.56 and Pereira $4,067.25 in overtime pay, multiple damages of $8,134.50, attorneys' fees of $4,220, and interest – for a total judgment of $17,416.27. (Trial Exs. 2 and 3). It is these judgments the Plaintiffs seek be determined nondischargeable.

### III. **FINDINGS OF FACT**

The Plaintiffs, who are brothers originally from Brazil, were credible and forthright in their testimony. While Simões speaks some English, Pereira speaks little English and each testified in their native Portuguese through an interpreter. The Plaintiffs worked for NAS, and a prior company in which the Debtor was involved, MFN, LLC ("MFN"), providing framing and carpentry services in the construction of substantial single family homes. Neither Simões or

5

Pereira were carpenters in Brazil, each learning the trade when they came to America. The Debtor observed that Simões was very talented. There was no testimony regarding Simões's work history before MFN and NAS, but Pereira testified he worked a number of jobs since arriving in the United States and that he was not paid overtime at any of those jobs.

Simões worked for MFN on a number of projects, including a project on Martha's Vineyard. Pereira also worked on the Martha's Vineyard project. At the beginning of the project, the Plaintiffs were paid by MFN LLC. (Trial Ex. 5). NAS then took over the project and issued checks to the Plaintiffs. (Trial Ex. 6). The Debtor testified that he took over the project at Martha's Vineyard when he formed NAS as his company. The Plaintiffs' compensation with respect to the Martha's Vineyard project was the substantial basis for the overtime claim in the State Court Litigation.

The Plaintiffs testified that the Debtor was on the jobsite in Martha's Vineyard every day and that he set the tasks for the day and supervised the framing crew. The framing crew consisted of Brazilian individuals who did not speak English, and Simões would communicate instructions to them because the Debtor did not speak Portuguese. Simões testified that, other than interpreting for the Debtor, he never hired, paid, established a pay rate for, or fired any worker. The Plaintiffs testified that the Debtor supplied the tools that they used on the job. Pereira testified that this included saws, nail guns, and compressors. The Debtor disputes that he instructed the Plaintiffs on when and how to work. He testified that he did not supply tools, but arranged for lifts and staging.

The record shows that Simões and Pereira worked long hours six days a week and did not take vacation. Simões maintained a record of the hours that the Plaintiffs worked each week along with other framers and that Simões reported the hours by email to an office administrator

at NAS named Kim Hines. She had the same role at MFN. The Plaintiffs were paid all of the amounts owed for their hours worked, and Simões testified that the hours were never questioned. The Debtor signed checks payable to Simões and Pereira. There is no evidence in the record of how other workers on the framing crew were paid, but there is also no evidence that amounts paid to the Plaintiffs correlated to all hours that may have been worked by the entire crew, rather than just Simões and Pereira, respectively. Simões testified that he did not pay the other workers on the crew. The Plaintiffs each testified that they never received any tax reporting forms from the Debtor, NAS, or MFN.

      Simões forthrightly testified that the Debtor was a "good guy" and that he had a good relationship with the Debtor until an accident occurred on a jobsite and the Plaintiffs were injured. It is undisputed that NAS did not pay overtime. Simões testified that on one occasion he asked about overtime and that the Debtor told him that the Debtor "already paid him too much money." The Debtor disputes that Simões ever asked about overtime pay and that it was not likely to have been raised by Simões because it would be inconsistent with their subcontractor arrangement. Simões also did not identify this conversation in response to broad interrogatories served by the Debtor. (Trial Ex. 58). Simões testified that he did not understand everything in the interrogatory requests and that he "can't remember everything." The Debtor testified that his "office" would have obtained certificates of insurance and issued 1099 forms to subcontractors and that he was mainly in the field acting as a construction supervisor – asserting that he had little administrative responsibility and awareness.

      The Debtor and Simões conflict in their testimony about how much control the Debtor had over the work performed by Simões and the framing crew while working for MFN and NAS. The Debtor's role and interest in MFN is also disputed. The Debtor testified that he worked for

MFN in the field as a construction supervisor and that he had no ownership interest in MFN. He testified that he was a "manager" and that MFN was owned by others named Matt and Fernando, but appeared to agree that the letters "MFN" correlated to the first names of Matthew Fink, Fernando Barbosa, and himself. At a deposition in an unrelated matter, the Debtor claimed that the "M" was not Matt, but Fernando's brother "Marcello." The Debtor also stated at a deposition in an unrelated case that "MFN was me." Trial Ex. 53, 6/30/2015 Debtor Tr. (Superior Court Docket No. CV2014-01495) 29:1. In response to interrogatories also in an unrelated matter, the Debtor once stated that MFN was owned by a Chinese national that he had never met. The Debtor disavowed his signature on a guaranty of MFN debt and stated that the signature on an MFN workers compensation insurance application that reflected MFN employed two carpenters in its framing business purporting to be his signature as "Manager" was not his signature. He testified that MFN did not employ any carpenters.

The Debtor was not credible in this testimony and in other testimony. In connection with claims asserted by the Plaintiff after their accident on a job, the Debtor sought workers compensation insurance coverage and testified that the Plaintiffs were employees of NAS and to multiple facts supporting that position. His explanation of why he testified to that classification of the Plaintiffs (that the insurance company's lawyer told him to do it) was not believable and supports an inference that the Debtor is willing to testify to suit his purposes. *See* Trial Ex. 27, 11/12/2010 Interview Tr. 6:22–8:11; Trial Ex. 28 (35:13–17).

The Debtor also testified that he only used subcontractors on his jobs and that Simões and "his" crew were subcontractors for framing on the job on Martha's Vineyard and other jobs. He testified that Simões hired and supervised his own workers. The Debtor could not produce evidence that NAS obtained a certificate of insurance for Simões or his crew or issued 1099s.

8

The Debtor stated that he acted in a manner common in the construction industry and that he believed that the Plaintiffs were independent contractors because they were not W-2 employees. On one bank record for NAS in a memo line for one check to Pereira, there is a reference to "subcontractors," but that memo does not appear on a copy of the corresponding check. (Trial Ex 6). There are no 1099s or subcontractor agreements with the Plaintiffs in the record. As previously mentioned, the Debtor testified that he relied on his office staff for paperwork to be issued to subcontractors.

      The Debtor contends that he was relying on his practice over a long period in the construction industry, he viewed the Plaintiffs as an independent crew of subcontractors, and there is no evidence that he personally benefitted in any way from not paying overtime. He testified that he bid jobs based on estimates of time given to him by Simões. There is no credible material evidence in the record that the Debtor was enriched by treating these Plaintiffs as if they were subcontractors – other than perhaps an inference that his company would have a bidding advantage when it came to pricing construction projects. The Debtor testified that NAS was in good financial condition, it did not have to sue clients to be paid, and NAS was paid in full for the Martha's Vineyard project. While the Plaintiffs also point to evidence that the Debtor obtained a $300,000 loan in connection with a separate real estate development, that does not necessarily demonstrate that funds were distributed to the Debtor from NAS to make the Debtor creditworthy. Any connection is tenuous. The fact that NAS was in "good financial" condition is also limited in value in that there was no evidence as to whether NAS could have paid overtime to all of its framers at the price bid on jobs or whether NAS obtained an unfair advantage in bidding on projects that personally benefitted the Debtor. The Debtor produced

9

limited records to the Plaintiffs claiming that records were destroyed when he was unable to maintain a storage locker.

The Debtor was not credible in many instances, and I find that the Debtor viewed classification of employees or subcontractors as a flexible and convenient means to an end that had costs and benefits to his business. When the Plaintiffs were injured, the Debtor attempted to manipulate their employment status for the benefit of his company to obtain workers' compensation insurance coverage for their injuries. He was aware that classifying the Plaintiffs as employees added cost to workers compensation insurance and all of the administrative expense and burdens of maintaining employees. I do credit his testimony, however, that he believed at the time that he had the right to classify workers as subcontractors, it was his general practice, and he perceived it to be a common practice in the construction industry. I also credit his testimony that Simões had authority over and assembled a crew to perform the framing and other portions of the jobs on which the Plaintiffs worked. I find that the Debtor took a calculated risk when he classified the Plaintiffs as subcontractors. The Plaintiffs agreed to perform services and had no expectation of being compensated overtime, like employees, and the Debtor was willing to take the risk that their classification as subcontractors could be challenged.

### IV. DISCUSSION

The primary dispute in this case is whether I should draw inferences from evidence in the record that the Debtor acted with requisite willfulness and malice to determine that the debts to the Plaintiffs should be nondischargeable under § 523(a)(6). The Plaintiffs introduced evidence that challenged the credibility of the Debtor, such as prior testimony and documentary evidence demonstrating what could be considered inconsistent with testimony of the Debtor in this Court. The Plaintiffs have adduced evidence of the Debtor's experience and training to support an

inference that the Debtor knew that NAS was acting in violation of wage laws and that the Debtor chose the Defendants because, as Brazilian immigrants working in this country, they may have been unaware of their right to be paid overtime and would be unlikely to complain or seek enforcement if they became aware.  Treating these workers as subcontractors would allow the Debtor to avoid costs and burdens of maintaining them as W-2 employees.  The Plaintiffs have also introduced evidence that the Debtor previously took a position that the Plaintiffs were employees of NAS after the Plaintiffs were injured while working for NAS  when it was in the Debtor's and NAS's interest to seek workers' compensation coverage relating to those injuries.  Additionally, MFN listed two carpenters as employees in the past, from which the Plaintiffs ask that I draw an inference that these Plaintiffs were previously considered employees when working for MFN doing the same tasks.  The Debtor testified that he worked with other framing subcontractors and other trade subcontractors on many other jobs and classified them all as subcontractors.

      The parties agree that there are few reported decisions regarding the dischargeability of debts on account of wage act-type liability and neither the parties nor the Court found cases involving non-payment of overtime for misclassified employees as opposed to non-payment of wages.  The Plaintiffs focus on two cases from this District where liability for non-payment of wages was determined to be non-dischargeable: *Chaves v. Ruhland (In re Ruhland)*, No. 11-19510-JNF, 2013 WL 1088737, at *8–9 (Bankr. D. Mass. Mar. 13, 2013) and *Faria v. Silva (In re Silva)*, No. 12-17413-WCH, 2014 WL 217889, at *10–11 (Bankr. D. Mass. Jan. 21, 2014).  In those cases, after a fact-intensive analysis, the courts determined that liability arising from unpaid wages were not dischargeable.

In *Ruhland*, the court (Feeney, J.) held that the willfulness of the Debtor's conduct was apparent from circumstantial evidence. Prior to employing the plaintiff, the debtor had been investigated by the Attorney General's Fair Labor Division and had "agreed to prospectively pay his workers in a timely manner, provide them with suitable pay stubs, and to pay overtime pay, as required by law, and to comply with the record-keeping requirements contained in [Mass. Gen. Laws ch.] 149, § 148 and 150A and [Mass. Gen. Laws ch.] 151, § 15, and all other employment related provisions, both state and federal . . . ." 2013 WL 1088737, at *4 (quotations omitted). The court further found that rather than comply with his agreement with the Attorney General and applicable Massachusetts law, "the Debtor had another plan: employ an undocumented worker with a limited education, who would be unlikely to complain to the Fair Labor Division. And better yet, encourage the Plaintiff to find friends or relatives to work for him under similar circumstances. Through this course of action, the Debtor, who did not maintain a checking account, intentionally avoided the requirements of Mass. Gen. Laws ch. 149, § 148 and, ideally, detection resulting from the violations of those requirements." *Id*. at *12.

From that circumstantial evidence in the case, the court ruled that the Debtor's conduct was willful and held that there could be no doubt that the debtor "knew that his nonpayment of wages would be substantially certain to harm the [p]laintiff." *Id*. The court focused on "the Plaintiff's repeated requests for his pay, the substantial amount of wages in arrears, the Debtor's history of wage law violations, and the absence of any credible explanation for the failure to pay the Plaintiff" in finding that the debtor in that case specifically intended to injure the plaintiff. *Id*. The court also considered the independent requirement of malice, quoting the standard in the First Circuit's decision in *Printy*, holding that "'[a]n injury to an entity or property may be a

12

malicious injury [under § 523(a)(6)] if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.'" *Id*. (quoting *Printy*, 110 F.3d at 859). The *Ruhland* court noted the debtor's evasive testimony and inconsistent statements in finding him not credible that he intended to pay the plaintiff. *See id*. The court also found that "[the debtor's] statements that his inability to pay the Plaintiff was the result of underbidding jobs was insufficient to rebut the evidence presented by the Plaintiff" concluding that "[t]he Debtor was paid for the painting services he performed, yet he elected to use the money he received for purposes other than the payment of the Plaintiff with knowledge that injury to the Plaintiff was substantially certain to occur." *Id*.

In *Silva*, the court (Hillman, J) discussed *Ruhland* and found the circumstances of that case to be similar to the matter before it:

> Similarly, in this case, the number of other employees that brought wage claims against the Debtor and the Debtor's admission that he paid employees with checks that had insufficient funds indicate that the Debtor's failure to pay his employees extended beyond his missed payments to the Plaintiff. Further, by June 2007, [the debtor's corporation Boston Office Cleaning's ("BOC's")] accounts with Capital were rapidly diminishing, BOC's checking accounts were running negative balances of thousands of dollars, and the Debtor had already failed to pay the Plaintiff her wages for part of April and all of May. Yet, rather than terminate the Plaintiff, he fraudulently promised to pay her in December, and retained her services for the month of June, despite knowing that BOC would almost certainly not have the funds to pay her at the end of the month. On top of this, the record indicates that the Debtor diverted the revenue that BOC did have to his personal expenses, instead of compensating his employees. Despite BOC's financial condition throughout 2007, the Debtor reported over $20,000 in income from BOC that year and paid over $20,000 in mortgage interest on his home. Moreover, the parties stipulated that the Debtor used BOC's corporate funds to pay his personal expenses, such as his car payments and utility bills. Given all of these circumstances, [Judge Hillman] found that the Debtor's failure to pay the Plaintiff was willful."

2014 WL 217889, at *10. As to the element of malice, the court further found that the evidence indicated that the Debtor unjustifiably used the funds of his business for his own expenses rather

13

than paying his employees, concluding that his conduct was without just cause or excuse. *Id.* at *11.

The Debtor relies on *Orr v. Marcella (In re Marcella)*, 463 B.R. 212 (Bankr. D. Conn. 2011), a case in which a court outside of this District held that liability arising from violation of a wage statute similar to the Massachusetts statute was held to be dischargeable. In *Marcella*, the court reiterated that "exceptions to discharge are strictly and narrowly interpreted so as to promote the Bankruptcy Code's purpose of providing a fresh start to debtors." 463 B.R. at 219 (citations omitted). The court also held that

> [a] breach of contract, or in this case, the violation of a strict liability statute, without conduct akin to an intentional tort, is not sufficient to render a debt nondischargeable. Furthermore, "[t]he mere failure to pay an obligation cannot be a willful and malicious injury in and of itself." *In re Buckallew*, 172 B.R. 927, 932 (Bankr. W.D. Mo. 1994) (a pre-*Geiger* decision citing, *inter alia*, 11 U.S.C. § 523(a)(6)); *Barclays American Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir.1985)). To hold that § 523(a)(6) is applicable to every failure to pay a debt, even in the absence of intentionally tortious conduct, would essentially render meaningless the protections afforded a debtor by the Bankruptcy Code, and vitiate its underlying purpose of providing relief to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. at 286–87, 111 S.Ct. 654.

*In re Marcella*, 463 B.R. at 220.

In *Marcella*, the court distinguished cases finding liability arising from wage act violations because the companies controlled by the debtors in those cases had sufficient assets to pay wages and did not – in bad faith – which failure constituted a willful tort, particularly where evidence showed substantial funds being diverted to the debtor that could have been used to pay wages. *See id*. at 220–221. The *Marcella* court found that the company employing the plaintiff did not have sufficient funds to pay wages owed to the plaintiff. *See id*. at 221 (concluding "there is no evidence of a 'diversion of assets', or that the Debtor lied to the Plaintiff about [the

14

business's] ability to timely pay her wages. In fact, the evidence is to the contrary, no asset diversion was evidenced, and the financial records of [the debtor's business] reveal negative account balances and numerous overdrafts during the relevant period."). In addition, even though the debtor withheld the plaintiff's paycheck, the court also did not find the debtor acted maliciously for purposes of § 523(a)(6), even though such conduct was without a valid defense under the Connecticut wage statute. *See id*. at 222.

None of the cases relied on by the parties involved overtime pay. In this case, we must confront whether payment of overtime is different. There was no evidence that either the Debtor or his company ever agreed to pay overtime. Plaintiffs do not dispute that. The question I must answer is whether there was a willful and malicious injury when there was no expectation among the parties that overtime would be paid. The Plaintiffs assert that there could be such injury and that I may draw an inference from the evidence that the Debtor has demonstrated a course of conduct to evade laws that entitle the Plaintiffs to overtime by taking advantage of their immigration status and language barriers because they would be unlikely to complain to authorities and have limited formal education – even if they were aware of their rights. The Debtor asserts that the Plaintiffs were paid every cent that they were promised and that the Debtor may have misclassified them as independent contractors, but it was not done with any intent to deprive them of overtime. The record is replete with contradictory testimony on many facts that might be relevant to a determination of whether the Debtor acted with the requisite intent.

While the Debtor took inconsistent positions as to whether the Plaintiffs were employees or subcontractors for purposes of the workers compensation matter and the Debtor's credibility was significantly tainted by inconsistencies highlighted by the Plaintiffs, non-payment of

overtime to the Plaintiffs under Massachusetts law, alone, does not satisfy the requirements of § 523(a)(6).

*Ruhland* and *Silva* are cases that found the requisite intent to support a finding of willfulness and malice in determining that personal liability for wages promised and unpaid to employees would not be discharged pursuant to § 523(a)(6). The Plaintiffs request a similar determination with respect to overtime that they should have been paid, but which was neither promised nor expected. The Plaintiffs have not met their burden to demonstrate that the Debtor willfully and maliciously caused injury to them by having his company misclassify them as subcontractors and not pay them overtime. Plaintiff's counsel skillfully attempted to create a record that the Debtor intentionally avoided a known legal obligation to benefit himself arguing that the only result of which could have been to deprive the Plaintiffs of overtime pay. Ultimately, I am not persuaded by a preponderance of the evidence that the Debtor had that intent or that he personally benefitted in the same way that the debtors in *Ruhland* and *Silva*, who were found to have had the requisite intent under § 523(a)(6), benefitted from not paying promised wages. The Debtor testified that all other tradespeople on the jobs were subcontractors and that he did not consider the Plaintiffs or anyone else employees. He also testified that his company used other subcontractors on other jobs as framers and carpenters. While his belief was misguided, and later misrepresented, the evidence at least equally supports the Debtor's testimony and a finding that the Debtor believed that he could classify the Plaintiffs as subcontractors. The Plaintiffs were handicapped in part by a lack of records, but there was also no direct evidence of how the Plaintiff was enriched by any act. Unlike in other cases, there is no evidence that the Debtor diverted assets resulting in known liabilities going unpaid. This is also not a case where the Debtor had been subject to earlier misclassification claims or where a

16

debtor deceived employees. He testified that no worker had ever asserted a claim to have been misclassified until the Plaintiffs did after their injury. There was no evidence presented by the Plaintiffs how other members of their "crew" were being paid – other than testimony by Simões that he did not pay them and that he gave their hours to the Debtor's administrative assistant. The evidence is contradictory regarding Simões's assertion that he asked the Debtor about overtime pay once. While generally very credible, the weight of Simões's testimony on this subject is diminished by his failure to recall that incident when he responded to interrogatories.

Violation of a state strict liability statute alone is insufficient to demonstrate the requisite intent to injure required by § 523(a)(6). Even where debtors have failed to pay wages promised to employees, some courts have analyzed dischargeability of personal liability imposed by statute as requiring more than a breach of contract or legal duty. *See In re Marcella*, 463 B.R. at 219–221. While the Plaintiffs have raised substantial concerns that the Debtor took advantage of them given their citizenship status, sophistication, and the fact that English is not their native language, after considering all of the facts and circumstances demonstrated by the record and reasonable inferences therefrom, the Plaintiffs have not met their burden to demonstrate that the Debtor acted willfully and with malice to injure the Plaintiffs in not paying overtime, even though the Debtor misclassified the Plaintiffs and violated the Massachusetts wage act.

Judgment shall enter in favor of the Debtor and the debts of the Debtor to the Plaintiffs shall be discharged.

By the Court,

Dated: September 29, 2022

Christopher J. Panos
United States Bankruptcy Judge

17